**In re UNITED MINE WORKERS OF AMERICA INTERNATIONAL UNION, Petitioner.**

No. 97–1109.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 8, 1998.

Decided Sept. 3, 1999.

Judith Rivlin argued the cause for petitioner. With her on the briefs was Grant Crandall.

Robin A. Rosenbluth, Attorney, U.S. Department of Labor, argued the cause for respondent. With her on the brief was W. Christian Schumann, Counsel.

Michael F. Duffy and Harold P. Quinn, Jr., were on the brief for intervenor National Mining Association.

Before: WALD, TATEL and GARLAND, Circuit Judges.

Opinion for the Court by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

The United Mine Workers of America (UMWA) petitions for a writ of mandamus to compel the Mine Safety and Health Administration (MSHA) of the Department of Labor to issue final regulations controlling gaseous emissions in the exhaust of diesel engines used in underground coal mines. In 1989, MSHA issued a Notice of Proposed Rulemaking (NPRM) to update air quality standards for hazardous substances in underground mines, including such gaseous emissions. Although the comment period closed in 1991, to date MSHA has not issued a final rule.

We find that the agency's failure to conclude its rulemaking violates the express timetable set forth by Congress in the Mine Safety and Health Act of 1977, 30 U.S.C. § 811(a)(4) ("Mine Act"). However, because all parties agree that MSHA is currently working on two other rulemakings with greater significance for miners' health, we decline to issue a writ that would move diesel exhaust gases to the top of the agency's regulatory agenda. During the course of this litigation, we issued an order requiring MSHA to file a definite schedule for completing rulemaking with respect to these gases. Because the agency's response was not definite, we grant the UMWA's alternative request that we retain jurisdiction, and we direct MSHA to file a series of status reports until it takes final agency action.

## I

MSHA regulations require operators of underground coal mines to test mine air for the presence of harmful gases. 30 C.F.R. § 75.322 (1998). Concentrations in excess of permissible exposure limits (PELs) set by the agency are forbidden. *Id.*[1] Since the early 1970s, those regulations have incorporated PELs established in 1972 by the American Conference of Governmental Industrial Hygienists. *Id.* MSHA recognizes that those levels are "outdated," 54 Fed.Reg. 35,760, 35,762 (Aug. 29, 1989), and concedes that its air quality standards, overall, "do not fully protect today's miners" in their present form. 63 Fed.Reg. 22,250, 22,250 (Apr. 27, 1998).

In 1983, MSHA published an Advance NPRM for an omnibus rulemaking involving a wide variety of air quality standards for underground mines, including PELs, respirator protection rules, and abrasive blasting and drill dust controls. *See* 48 Fed.Reg. 31,171 (July 6, 1983). In 1989, MSHA issued an NPRM that included over 600 PELs and was intended to "eliminate outdated incorporations by reference in the existing standards." 54 Fed.Reg. at 35,762. Among the 600 were PELs for diesel exhaust gases. *See id.* at 35,807. The record for the omnibus air quality rulemaking closed in August 1991. *See* 56 Fed.Reg. 29,201 (June 26, 1991). In the eight years since, the agency has neither promulgated nor rescinded the proposed PELs, and has concluded only one portion of the air quality rulemaking (relating to abrasive blasting and drill dust control). *See* 59 Fed.Reg. 8318 (Feb. 18, 1994).

MSHA has, however, taken other steps to protect coal miners from exposure to diesel exhaust. The most significant is the regulation of the use and maintenance of diesel equipment. In 1987, MSHA convened an advisory committee "to provide advice on the complex issues concerning the use of diesel-powered equipment in underground coal mines." REPORT OF MSHA ADVISORY COMM. ON STANDARDS & REGS. FOR DIESEL-POWERED EQUIPMENT IN UNDERGROUND COAL MINES 1 (July 1988) [hereinafter ADVISORY COMM. REPORT]. MSHA accepted the committee's recommendation to develop regulations to govern the approval and use of diesel-powered equipment. *Id.* at 7–9. In 1989 the agency issued an NPRM, and in 1996 it promulgated final rules. *See* 61 Fed.Reg. 55,412 (Oct. 25, 1996). Among other things, the new rules require agency approval of most diesel engines; mandate that engines use low-sulfur fuel and be clean-burning; limit their gaseous emissions; and establish monitoring and ventilation requirements when they are in use. *See id.* at 55,412–14. Upon promulgating the rules, MSHA stated that its "[e]xperience confirms that compliance with these regulations … produces engines that operate without excessive gaseous emissions that can be harmful to miners." *Id.* at 55,419. The effective dates for the rules were staggered; final compliance is scheduled for November of this year. *See* 30 C.F.R. § 75.1907(b), (c).

Several of the diesel equipment rules contain requirements that depend upon PELs for diesel exhaust gases.[2] At the time MSHA issued its NPRM for the equipment rules in 1989, the agency anticipated that the omnibus air quality rulemaking would be completed before the final equipment rules were promulgated. 54 Fed.Reg. 40,950, 40,958 (Oct. 4, 1989). At the recommendation of its advisory committee, MSHA said it would await the conclusion of the omnibus air quality rulemaking, rather than update the PELs for

---

1. For the sake of simplicity, we will uniformly use the phrase "permissible exposure limits" (PELs), although MSHA also uses "threshold limit values" (TLVs) to refer to the same concept. *See* 54 Fed.Reg. 40,950, 40,958 (Oct. 4, 1989).

2. For example, one rule requires mine operators to "take appropriate corrective action" once the concentration of carbon monoxide (CO) or nitrogen dioxide ($NO_2$) exceeds half of their PELs. 30 C.F.R. § 70.1900(c); *see also id.* § 75.325(j) (permitting higher levels of CO and $NO_2$ if air sampling demonstrates continuous compliance with PELs).

the diesel exhaust gases through the equipment rulemaking. *See id.* ("[E]xposure limits for the gaseous contaminants in diesel exhaust should not be unique from the exposure limits set for the same contaminants generated by other mining sources such as blasting."); ADVISORY COMM. REPORT at 67 (same). By the time MSHA promulgated the final equipment rules in 1996, however, the omnibus air quality rulemaking still had not been completed. The agency nonetheless decided "not [to] adopt updated exposure standards at this time because this issue remains in the rulemaking process for Air Quality standards." 61 Fed.Reg. at 55,-420. The UMWA did not challenge this or any other aspect of the equipment rules.

On March 3, 1997, the UMWA filed a petition for a writ of mandamus directing the agency to issue regulations governing emissions in diesel exhaust. UMWA Pet. at 1, 4. Specifically, it sought controls over two components of exhaust: gases and particulate matter. UMWA Reply Br. at 1–2, 19–20 (June 30, 1997). Shortly before the case was scheduled for oral argument, the parties commenced settlement negotiations and requested that the case be removed from the court's argument calendar. These discussions eventually led to MSHA's publication of an NPRM for the regulation of diesel particulate matter. *See* 63 Fed.Reg. 17,492 (Apr. 9, 1998). That rulemaking is currently ongoing.

Citing the proposed diesel particulate regulations, as well as the final diesel equipment rules, MSHA then moved to dismiss the UMWA's petition as moot. A special panel of this court granted the motion in part, dismissing the diesel particulate portion of the petition. The panel restored the balance of the petition to the court's active docket, and directed MSHA to address the issue of gaseous emissions. *In re United Mine Workers of America, Int'l Union,* No. 97–1109 (D.C.Cir. June

28, 1998). The UMWA does not dispute the partial dismissal of its petition, noting that the proposed particulate rule "addresses part of what [it] seek[s]." UMWA Reply Br. at 1 (Aug. 5, 1998). Accordingly, the only matter before us is the issue of diesel exhaust gases. The two gases in question are carbon monoxide (CO) and nitrogen dioxide ($NO_2$).[3]

## II

█ We consider first the contention of the National Mining Association, intervenor in this case, that the UMWA's petition is tantamount to an untimely challenge to MSHA's 1996 diesel equipment rules. As the Association correctly observes, the Mine Act requires that petitions for review of MSHA safety or health standards must be filed within sixty days of promulgation. *See* 30 U.S.C. § 811(d). The UMWA did not file a challenge to MSHA's diesel equipment regulations, and its petition for a writ of mandamus was filed over two months after the sixty-day deadline for doing so had passed. Accordingly, the Association suggests that we dismiss the UMWA's petition as untimely.

But the union's petition for a writ of mandamus to compel action on the diesel exhaust PELs does not constitute a challenge to the agency's diesel equipment rules. From the outset, the agency disavowed any intention to consider new PELs for the diesel exhaust gases during its diesel equipment rulemaking, stating that the PELs would be reexamined as part of its omnibus air quality rulemaking. *See* 54 Fed.Reg. at 40,958. The UMWA does not take issue with that decision, or any other aspect of the diesel equipment rules. Although the PELs are plainly related to the equipment rules, since the latter incorporate them for certain equipment standards, the UMWA's challenge is to the content of the PELs and not to the agency's decision

---

**3.** The UMWA originally identified three gases as components of diesel exhaust: CO, $NO_2$, and nitric oxide (NO). UMWA Pet. at 2. MSHA states that its 1989 air quality NPRM did not propose lowering the existing exposure limit for NO, *see* MSHA Sched. at 1 n.1 (Dec. 23, 1998), a fact which the UMWA does not contest.

to incorporate them into the equipment rules. Indeed, had the UMWA challenged the diesel equipment rules on the ground that MSHA had failed to include revised PELs for diesel exhaust gases, we might well have denied its petition as premature. *See National Mining Ass'n v. MSHA,* 116 F.3d 520, 549 (D.C.Cir.1997) ("An agency does not have to 'make progress on every front before it can make progress on any front.'") (quoting *Personal Watercraft Indus. Ass'n v. Department of Commerce,* 48 F.3d 540, 544 (D.C.Cir.1995)).

Because the UMWA does not complain about what the agency has done but rather about what the agency has yet to do, we reject the suggestion that its petition is untimely and move to a consideration of the merits.

## III

■ The UMWA seeks a writ of mandamus under the All Writs Act, 28 U.S.C. § 1651(a), to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1) (Administrative Procedure Act). Although we plainly have jurisdiction over such requests,[4] "[m]andamus is an extraordinary remedy [and] we require similarly extraordinary circumstances to be present before we will interfere with an ongoing agency process." *Community Nutrition Institute v. Young,* 773 F.2d 1356, 1361 (D.C.Cir.1985). In exercising our equitable powers under the All Writs Act, we are guided by the factors outlined in *Telecommunications Research & Action Center v. FCC (TRAC)* for assessing claims of agency delay:

(1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic

regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

750 F.2d 70, 80 (D.C.Cir.1984) (citations omitted).

### A

■ Central to the UMWA's petition is the second *TRAC* factor (which, as *TRAC* notes, gives content to the first). The union contends that MSHA is in violation of the regulatory timetables imposed by Congress in the Mine Act. It relies on two provisions of the Act as setting those timetables. The first requires the Secretary of Labor to act on an advisory committee's recommendation within sixty days of its submission. 30 U.S.C. § 811(a)(2). We agree with MSHA, however, that the sixty-day advisory committee deadline is inapplicable here. MSHA's advisory committee on diesel equipment recommended that the agency adopt new equipment regulations, *see* ADVISORY COMM. REPORT at 7–9, and "set in motion a mechanism whereby a diesel particulate standard can be set," *id.* at 9. MSHA has acted on those recommendations by promulgating the diesel equipment rules and issuing an NPRM for diesel particulate. But the advisory committee recommended against using the equipment rules to set new PELs for gaseous emissions in diesel exhaust, deferring instead to the ongoing omnibus air quality rulemaking (as to which there was no advisory committee). *See id.* at 67. Hence, the sixty-day deadline is inapplicable to the regulations at issue here.

---

4. *See, e.g., Oil, Chem. & Atomic Workers Int'l Union v. Zegeer,* 768 F.2d 1480, 1484–86 (D.C.Cir.1985) (upholding judicial authority to review claims of unreasonable delay under the Mine Act); *Telecommunications Research & Action Ctr. v. FCC,* 750 F.2d 70, 75–77, 79 (D.C.Cir.1984).

The second timetable provision on which the UMWA relies requires the Secretary of Labor to promulgate final regulations, or to explain her decision not to promulgate them, within ninety days of the certification of the record of a hearing if one is held, or of the close of the public comment period if a hearing is not held. *See* 30 U.S.C. § 811(a)(4). At oral argument, MSHA conceded that the ninety-day rule does apply to the omnibus air quality rulemaking. The last of the hearings in connection with that rulemaking was held on March 27, 1991, and the record closed in August of that year. *See* 56 Fed.Reg. at 29,201. Eight years later, the agency has taken no action on any portion of the proposed regulations, other than that relating to abrasive blasting and drill dust control.

MSHA nonetheless contends that it is not in violation of the ninety-day deadline because Congress intended it to have discretion to defer action despite that deadline. In support of this proposition, MSHA relies on *National Congress of Hispanic American Citizens v. Usery,* 554 F.2d 1196 (D.C.Cir.1977), in which the plaintiffs sued to compel the Occupational Safety and Health Administration (OSHA) to comply with the rulemaking timetables of section 6(b) of the Occupational Safety and Health Act ("OSH Act"). *See* 29 U.S.C. § 655(b). Rejecting the plaintiffs' claim, we found that "traditional agency discretion to alter priorities and defer action" permitted OSHA to deviate from the statutory deadlines. 554 F.2d at 1200. Although the government contends that the timetable provision in the Mine Act is similar to that in the OSH Act, critical to our holding in *National Congress* was section 6(g) of the latter, which explicitly authorizes OSHA to "determin[e] the priority for establishing standards" with "due regard to the urgency of the need for man-

datory safety and health standards for particular industries, trades, crafts, occupations, businesses, workplaces or work environments." 29 U.S.C. § 655(g); *see* 554 F.2d at 1199–1200. As we subsequently observed in *Action on Smoking & Health v. Department of Labor,* 100 F.3d 991, 994 (D.C.Cir.1996), this provision was "the main reason we gave for treating [the OSH Act's deadlines] as non-mandatory." But as MSHA concedes, the Mine Act contains no counterpart to section 6(g) giving it similar flexibility to set aside statutory deadlines. *See* MSHA Br. at 16.[5]

Nor are we persuaded by MSHA's broader claim that the Mine Act's deadlines are merely hortatory. *See In re Barr Labs., Inc.,* 930 F.2d 72, 74 (D.C.Cir. 1991) (rejecting similar claim by FDA). Nothing about the language of those deadlines suggests they are anything other than mandatory. *See, e.g.,* 30 U.S.C. § 811(a)(4)(B), (C) ("[T]he Secretary, within 90 days after the period for filing ... objections has expired, *shall* by rule promulgate, modify, or revoke such mandatory standards" or "publish his reasons" for concluding "that a proposed mandatory health or safety standard should not be promulgated....") (emphasis added). Failing to find support in the statutory language, MSHA points us to the following sentence from the Senate Report on the Mine Act: "[T]he Committee realizes that despite the exercise of good faith, the Secretary may in certain cases be unable to meet the time limitations." S.Rep. No. 95–181, at 20 (1977). This sentence, however, must be read in context. The sentence that follows reads: "Failure to meet the time frames in such cases should not be grounds for challenging the validity of the standard." *Id.* This bespeaks not a congressional intention to give the agency unlimited flexibility to delay promulgation,

---

5. It is true, as MSHA notes, that the Mine Act permits the Secretary to extend the comment period on a proposed rule, 30 U.S.C. § 811(a)(2); but the Secretary did not extend the period past August 1991 and it is now closed. It is also true that the Act does not

set a time limit on the length of hearings or specify a time within which the record must be certified, *see id.* § 811(a)(3); but MSHA has now ended the hearings and does not contend that the record remains uncertified.

but rather a concern that a violation of the deadlines not serve to invalidate a completed rule.

This reading is supported by consideration of the passage that immediately precedes the sentence quoted by MSHA. The statutory timetable, the Committee said,

> eliminates the possibility of the lengthy standard promulgating procedures, which have too often been experienced under the current Coal and Metal Acts, by putting a closure date on the several steps of the process. Once the standard promulgation procedure begins, it is regulated within a specific statutory time frame. This procedure should facilitate more expeditious promulgation of standards.

*Id.* The Report thus makes clear that Congress did intend the ninety-day rule to "put[ ] a closure date" on the rulemaking process. *Id.*

█ We also reject MSHA's claim that its breach of the deadline is excused by additional rulemaking requirements that Congress has imposed on agencies since the Mine Act was passed in 1977, including the Regulatory Flexibility Act of 1980 (as amended by the Small Business Regulatory Enforcement Fairness Act of 1996), and the Paperwork Reduction Act of 1980. *See* 5 U.S.C. §§ 601–612; 44 U.S.C. §§ 3501–3520. Despite the increased requirements this legislation imposes on the agency, nothing in either of these general-purpose statutes indicates a congressional intention to set aside the specific timetables of the Mine Act (or any other statute). Nor are we persuaded by MSHA's complaint that a 1993 executive order "makes compliance with Section 101(a)'s timetables virtually impossible," by requiring agencies to submit their rules for up to ninety days of pre-publication review by the Office of Management and Budget. MSHA Br. at 17 n.7; *see* Exec. Order No. 12,866, § 6(b)(2)(B), 58 Fed.Reg. 51,735, 51,742 (Sept. 30, 1993). Needless to say, the President is without authority to set aside congressional legislation by executive order, and the 1993 executive order does not purport to do so.

We conclude that Congress meant what it said. In the words of the Senate Report, "[w]ithin 90 days of the certification of the hearing record (or of the close of the comment period if no hearing is required), the Secretary is *required* to issue his final rule or to make a determination not to issue the proposed rule." S.REP. No. 95–181, at 20 (emphasis added). As the Secretary concededly has done neither here, she is in clear violation of the Mine Act. *See Barr Labs.,* 930 F.2d at 74. Indeed, even if we were to read the statute not as specifying an express "timetable" for decision, but as merely providing an "indication of the speed with which [Congress] expects the agency to proceed," *TRAC,* 750 F.2d at 80, it would still be clear that the agency has transgressed congressional expectations. The eight-year delay here is simply not in the same ballpark as the ninety-day period contained in the statute, a timetable intended to "eliminate the possibility of ... lengthy standard promulgating procedures." S.REP. No. 95–181, at 20; *see also id.* at 18; H.R.REP. No. 95–312, at 17–18 (1977); *Oil, Chem. & Atomic Workers Int'l Union v. Zegeer,* 768 F.2d 1480, 1488 (D.C.Cir.1985) (noting "indications in the legislative history of the Mine Act that Congress did not expect MSHA to tarry for years over its health and safety rulemakings").

**B**

█ Our conclusion that the Secretary has violated the deadline set forth in the Mine Act does not end the analysis. As we have noted before, "[e]quitable relief, particularly mandamus, does not necessarily follow a finding of a [statutory] violation...." *Barr Labs.,* 930 F.2d at 74. Indeed, not even the UMWA urges us to hold the agency strictly to a ninety-day deadline. Accordingly, we must continue our analysis of the remaining *TRAC* factors to determine whether mandamus is appropriate in this case.

The UMWA contends that the third *TRAC* factor, which directs us to be particularly wary of delay when human health and welfare are at stake,[6] also weighs in favor of mandamus. MSHA responds that although the rulemaking involves human health and welfare, they are not "at stake" because it has "no scientific data that underground coal miners are currently suffering a significant risk of material impairment from overexposure to gaseous emissions in diesel exhaust." Thaxton Aff. ¶ 8.[7] While the UMWA cites some (primarily anecdotal) evidence regarding health effects from exposure to diesel exhaust, *see* UMWA Response to MSHA Sched. at 4 (Jan. 11, 1999), that evidence fails to distinguish between the distinct contributions of diesel particulate matter (which MSHA acknowledges as a health concern) and the diesel exhaust gases at issue here. Moreover, MSHA believes that the new diesel equipment rules, already partially in effect and scheduled to take full effect this November, are substantially reducing the levels of gaseous emissions actually occurring in mines regardless of the current PELs. *See* Thaxton Aff. ¶ 12.

Even without fully crediting MSHA's data and predictions, there is no question that in this case we have substantially less evidence that delay would put human health at risk than we had in *Public Citizen Health Research Group v. Auchter*, where we ordered OSHA to issue an NPRM setting an exposure limit for ethylene oxide (EtO) within thirty days. 702 F.2d 1150, 1159 (D.C.Cir.1983). In that case, the district court had found, supported by "[a]mple evidence in the record,"

*id.* at 1157, that workers were being "subjected to grave health dangers from exposure to ethylene oxide within the currently permissible range," *id.* at 1153. *See also In re International Chem. Workers Union*, 958 F.2d 1144, 1150 (D.C.Cir.1992) (requiring OSHA to adhere to schedule in light of "admittedly serious health risks associated with the current permissible levels of cadmium exposure"). Not only is there no such evidence in the record here, the UMWA has not even suggested that a "grave danger to human life" arises from exposure to diesel gases at current levels. *Auchter*, 702 F.2d at 1159.

MSHA also argues that since its entire regulatory agenda concerns health and welfare issues, the third *TRAC* factor cannot carry as much weight as it otherwise might. *See Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C.Cir.1987) (noting that third *TRAC* factor "can hardly be considered dispositive when ... virtually the entire docket of the agency involves issues of this type"). In the circumstances of this case, that argument is just another way of invoking the fourth *TRAC* factor—the need to consider the consequences of expediting one rulemaking on the progress of other agency priorities—when the agency's other priorities also involve human health and welfare.[8] As MSHA points out, the two gases of concern here represent only a small fraction of the over 600 contaminants of mine air at issue in the omnibus air quality rulemaking. To single out diesel exhaust gases and designate them for expedited treatment might well delay rulemaking for other contaminants that are at least as dangerous to the health of the

---

6. As in *Barr Laboratories*, 930 F.2d at 75, in this case the third *TRAC* factor overlaps with the fifth, which directs us to "take into account the nature and extent of the interests prejudiced by delay." *TRAC*, 750 F.2d at 80.

7. *See also* NCI/NIOSH INTERAGENCY PROJECT, A COHORT MORTALITY STUDY WITH A NESTED CASE-CONTROL STUDY OF LUNG CANCER AND DIESEL EX-HAUST AMONG NON-METAL MINERS 6 (1995) ("[T]he gases and vapors in the diesel exhaust ... are not thought to be strong mutagens or

carcinogens at the levels at which they occur.").

8. *Accord Sierra Club*, 828 F.2d at 798 ("[W]hether the public health and welfare will benefit or suffer from accelerating this particular rulemaking depends crucially upon the competing priorities that consume EPA's time, since any acceleration here may come at the expense of delay of EPA action elsewhere.").

nation's miners. *See generally Action on Smoking,* 100 F.3d at 994; *Barr Labs.,* 930 F.2d at 73, 75.

Indeed, citing the fourth *TRAC* factor, MSHA points to two other contaminants, not covered by the omnibus air quality rulemaking, that it ranks as considerably more dangerous than diesel exhaust gases, and whose control is thus of higher priority to the agency: diesel particulate matter, the subject of a pending rulemaking noted above, and respirable dust, which is associated with black lung disease and silicosis. By contrast to diesel exhaust gases, the agency says, data shows that exposure to these contaminants does materially impair the health of miners. MSHA Sched. at 7–8 (Dec. 23, 1998); *see also* 63 Fed.Reg. at 17,538; 63 Fed.Reg. 62,000, 62,000 (Nov. 9, 1998).

The UMWA does not disagree. It is sometimes the case with mandamus petitions that the agency's priorities are of little concern to the petitioner, whose goal is simply to force its matter to the front of the line. *See* KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 12.3, at 225 (3d ed.1994) (noting that judicial enforcement of statutory deadlines may "confer on the private parties who are potential petitioners the discretion to determine the agency's priorities and its allocation of resources among the tasks that are subject to deadlines"). Here, however, the UMWA candidly stated at oral argument that it could not characterize diesel exhaust gases as its highest priority among all mine safety regulations. It agreed it was possible that the diesel equipment rules alone may have the desired effect of reducing exposure to those gases. And it further agreed that control of diesel particulate matter and respirable mine dust rank as higher priorities. We must, therefore, take care not to craft a remedy for MSHA's statutory violation

that could both interfere with the agency's internal processes and damage the very interests the petitioner seeks to protect. *Compare Auchter,* 702 F.2d at 1158 ("We would hesitate to require [OSHA] to expedite the EtO rulemaking if such a command would seriously disrupt other rulemakings of higher or competing priority.").

**C**

 Although there is insufficient record evidence that a substantial health risk would result from some further delay in promulgating the regulation petitioner seeks, and no dispute that the agency's priorities are appropriate, the fact remains that the delay here has been substantial. Congress directed MSHA to use "the latest available scientific data in the field" to set exposure standards that will ensure "that no miner will suffer material impairment of health or functional capacity." 30 U.S.C. § 811(a)(6)(A). Despite that statutory mandate, the agency's PELs are now twenty-seven years old, promulgated at a time when coal mines employed diesel engines with far less frequency. *See* 30 C.F.R. § 75.322; 61 Fed.Reg. at 55,412. The same scientific organization that authored the PELs originally incorporated by MSHA now advocates lower airborne concentrations for many substances, including CO and $NO_2$; indeed, it advocates reducing the current PEL for CO by half and for $NO_2$ by two-fifths. *See* AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL HYGIENISTS, TLVs AND BEIs: THRESHOLD LIMIT VALUES FOR CHEMICAL SUBSTANCES & PHYSICAL AGENTS AND BIOLOGICAL EXPOSURE INDICES 23, 52 (1999) (recommending that PEL for CO be lowered from 50 ppm to 25, and that PEL for $NO_2$ be lowered from 5 ppm to 3). MSHA has failed "to meet its self-declared prior deadlines" for action on air quality standards, *TRAC,* 750 F.2d at 80,[9] and concedes that its existing stan-

9. *Compare* 54 Fed.Reg. at 40,958 (stating in 1989 that "[b]ecause of the particular importance of such standards to miners exposed to diesel exhaust, the Agency further intends that the air quality rulemaking will be final by the time that this rulemaking on . . . diesel equip-

ment is complete"), *with* 61 Fed.Reg. at 55,-420 (promulgating final equipment rules in 1996 but noting that "updated exposure standards . . . remain[ ] in the rulemaking process for Air Quality standards").

dards are "outdated," 54 Fed.Reg. at 35,-762. However many priorities the agency may have, and however modest its personnel and budgetary resources may be, there is a limit to how long it may use these justifications to excuse inaction in the face of the congressional command to act within ninety days. *Compare Sierra Club,* 828 F.2d at 797 (denying writ where "[n]o statutory deadline limits the duration of rulemakings.... [and there is no] generalized congressional mandate for EPA to expedite").

Notwithstanding the length of time by which its decision on this issue is overdue, the agency's briefs contained no hint of a schedule for coming into compliance with the Mine Act. To the contrary, the agency said only that it "continues to vigorously work on the portion of the [air quality] rulemaking to which [it] has given priority." MSHA Br. at 20. Since the portion of the rulemaking involving diesel exhaust gases is concededly not the agency's priority, that statement suggested that MSHA was not working "vigorously" on the matter at issue here. At oral argument, MSHA was somewhat more, but not much more, forthcoming about its plans for issuing revised PELs for diesel exhaust gases.[10]

In light of the agency's vagueness, and in order to assist us in determining whether to exercise our discretion to issue the requested writ, on December 9, 1998 we directed MSHA to file "a definite schedule for completing rulemaking with respect to the diesel emission gases, and an explanation justifying that schedule." *In re United Mine Workers of America Int'l Union,* No. 97–1109, at 2 (D.C.Cir. Dec.9, 1998) (unpublished order).[11] In response to our order, the agency submitted the following

schedule "for completing rulemaking on the gases in diesel exhaust": (1) December 1999—complete data collection; (2) June 2000—complete analysis of the data, decide whether to proceed with rulemaking, and publish decision not to proceed if that is the agency's conclusion; (3) December 2000—issue new NPRM if the agency decides to proceed with rulemaking; (4) December 2001—promulgate final rule. *See* MSHA Sched. at 2, 9 (as corrected Jan. 13, 1999).

This schedule and the explanations the agency offers for each of its four phases are not facially unreasonable. First, it would not be unreasonable for it to take MSHA a year (until December 1999) to collect additional data to determine whether a regulation is still necessary. Additional data regarding current levels of exposure to diesel exhaust gases is required, the agency says, because it currently has no data that miners are suffering material impairment from overexposure to such gases, and because preliminary data suggests that the new diesel equipment rules have significantly lowered the amount of such gaseous emissions. This data collection should be accomplished when diesel emissions are greatest, the agency continues, which happens only during "longwall moves" that occur once or twice a year. Finally, the agency states that data collection cannot be completed until December 1999 because the impact of the new equipment rules will not be fully measurable until they completely take effect in November 1999. As the UMWA concedes that the diesel equipment rules may reduce exposure to diesel exhaust gases even with the current PELs in place, a plan to

---

10. Although there was some equivocating, we understood agency counsel to state that the agency expected it would take a year to issue an NPRM for revised PELs for diesel exhaust gases, and another year to promulgate a final rule—and we so noted in our December 1998 order. MSHA's post-argument schedule lengthens this projection by at least a year, without explaining or even mentioning the discrepancy.

11. *See International Chem. Workers,* 958 F.2d at 1147 (directing OSHA, after oral argument, to "file a report with the court indicating the status of the proposed rule and the date by which the agency expects to issue a final cadmium rule"); *United Steelworkers of America v. Rubber Mfrs. Ass'n,* 783 F.2d 1117, 1119 (D.C.Cir.1986).

collect data on a one-year schedule would not be unreasonable.

Second, it would not be unreasonable for MSHA to require six months (until June 2000) to analyze the data, to decide whether to proceed with rulemaking regarding diesel exhaust gases, and to publish a decision not to proceed if that is its conclusion. This phase is drawn out somewhat because the agency's resources are primarily devoted to other priorities, particularly respirable mine dust and diesel particulate matter. In light of these considerations, six months would not be an unreasonable amount of time to evaluate what the agency has collected, to determine whether exhaust gases need to be regulated, and to determine at least preliminarily whether, as required under the Mine Act, a lower standard is "feasib[le]." 30 U.S.C. § 811(a)(6)(A).

Third, if MSHA does decide to go forward, the agency's filing provides a justification for taking another six months (until December 2000) to issue a new NPRM. The agency plans to issue a new NPRM for diesel exhaust gases, rather than continue with the 1989 NPRM for the omnibus air quality rulemaking, in part because of the Eleventh Circuit's decision in *AFL–CIO v. OSHA*, 965 F.2d 962 (11th Cir. 1992). In that case, the court invalidated omnibus OSHA regulations that revised PELs for 428 toxic substances because the agency failed to analyze each individual toxin with sufficient particularity. MSHA fears that its 1989 omnibus NPRM could be vulnerable for the same reason. In addition, MSHA notes that it is now subject to statutory rulemaking requirements that were not considered in 1989, *see* 2 U.S.C. § 1501 *et seq.* (Unfunded Mandates Reform Act of 1995); 5 U.S.C. §§ 601–612 (Small Business Regulatory Enforcement Fairness Act of 1996), and that any newly-proposed PELs would be based on data not available when it drafted the original NPRM. Although it might still be possible for MSHA to go forward on the current rulemaking record, the agency's plan may well shorten the overall period of delay by resolving issues that would otherwise become the subject of litigation. *See Sierra Club*, 828 F.2d at 798–99 ("[B]y decreasing the risk of later judicial invalidation and remand to the agency, additional time spent reviewing a rulemaking proposal before it is adopted may well ensure earlier, not later, implementation of any eventual regulatory scheme.").

Finally, it would not be unreasonable for it to take MSHA a year (until December 2001) to complete the fourth phase of the schedule, running from the issuance of the NPRM through the promulgation of a final rule. By way of rationale, the agency states that it is required to provide a public comment period, that it anticipates receiving comments from a substantial number of interested parties, that it will have to analyze those comments, and that it may then have to revise the rule to take the comments into account. It is difficult for us to second-guess this projection in light of the "host of complex scientific and technical issues" involved in the promulgation of revised PELs. *United Steelworkers*, 783 F.2d at 1120; *see id.* (accepting 14–month period from NPRM to final rulemaking as not "facially unreasonable" in light of complex technical issues and fact that "OSHA obviously cannot know at present how many comments it will receive or the nature of those comments").[12]

In sum, a reasonably definite schedule along the above lines would represent a good faith effort by MSHA to come into compliance with it statutory obligations under the Mine Act. The problem is that we cannot fairly describe MSHA's schedule as "reasonably definite." The agency does not even attempt to characterize the final promulgation date as a reliable estimate. *See, e.g.*, MSHA Sched. at 13 ("[The Secretary] will not be able to promulgate a

---

12. That said, MSHA must nonetheless be mindful of its statutory obligation to issue the final rule within ninety days of the certification of the hearing record, or of the close of the public comment period if no hearing is held. 30 U.S.C. § 811(a)(4).

final rule *until at least* December 2001.") (emphasis added). And although MSHA appears to characterize as firm the June 2000 date for deciding whether to proceed and the December 2000 date for issuing a new NPRM,[13] it ultimately hedges even as to those interim dates.[14]

To advise us that regulations will not issue until "at least December 2001" is to provide no end-date at all. It is unresponsive to our order to provide a "definite schedule," and it offers no assurance that the agency will remedy its continuing violation of the Mine Act. Accordingly, MSHA's response is insufficient to justify its request that we deny the union's petition "in its entirety." MSHA Br. at 20. And while the considerations recounted in Parts III(A) and III(B) persuade us that issuance of a writ of mandamus at this time could do more harm than good, we accept the UMWA's alternative suggestion that we retain jurisdiction of this matter. UMWA Reply Br. at 8 (Aug. 5, 1998); *see Monroe,* 840 F.2d at 947; *TRAC,* 750 F.2d at 80–81; *In re Center for Auto Safety,* 793 F.2d 1346, 1354 (D.C.Cir.1986).

## IV

For the foregoing reasons, the court will retain jurisdiction over this case until there is a final agency disposition that discharges MSHA's obligations under the Mine Act. The agency is directed to advise the court on the date such disposition occurs, and of the status of this matter on each of the following dates unless final disposition has already occurred: December 31, 1999; June 30, 2000; December 31, 2000; and December 31, 2001. Prior to final agency action, the UMWA may petition this court to grant additional appropriate relief in the event MSHA fails to

adhere substantially to a schedule that would, as described in Part III(C), constitute a good faith effort by MSHA to come into compliance with the Mine Act. *See Monroe,* 840 F.2d at 947; *TRAC,* 750 F.2d at 80–81; *see also Zegeer,* 768 F.2d at 1488 ("[I]f MSHA should fail to act with appropriate diligence in following the estimates it has tendered to this court, petitioners may invoke our authority to direct MSHA to complete the rulemaking process with due dispatch.").

*So ordered.*

**13.** *See* MSHA Sched. at 8–9 ("If the Secretary determines [not to proceed], *she will decide ... and will publish* the reasons for that determination ... *by* June 2000.... [If] the Secretary decides that she will proceed with rulemaking on the gases in diesel exhaust, *she will issue* a new notice of proposed rulemaking *by* December 2000.") (emphasis added) (as corrected Jan. 13, 1999).

**14.** *See, e.g.,* MSHA Sched. at 4 ("[I]t will take *at least* a year to collect a sufficient body of

data....."); *id.* at 6 ("[I]t will take *at least* six months to review and analyze the data...."); *id.* at 12 ("[I]t will take *at least* six months from the time the Secretary decides to proceed ... to the time the Secretary issues a notice of proposed rulemaking.") (emphasis added in all parentheticals).