Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued March 16, 2004        Decided June 22, 2004

No. 03-1122

IN RE: AMERICAN RIVERS AND
IDAHO RIVERS UNITED,
PETITIONERS

————

On Petition for Writ of Mandamus

————

*Jonathan R. Lovvorn* argued the cause for the petitioners. *Amy R. Atwood* and *Eric R. Glitzenstein* were on brief.

*Dennis Lane*, Solicitor, Federal Energy Regulatory Commission, argued the cause for the respondent. *Cynthia A. Marlette*, General Counsel, Federal Energy Regulatory Commission, was on brief. *Beth G. Pacella*, Attorney, Federal Energy Regulatory Commission, entered an appearance.

*James B. Vasile, Hubert A. Farbes, Jr.* and *Mark J. Mathews* were on brief for the intervenor.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before:  EDWARDS and HENDERSON, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: In 1997 a coalition of environmental organizations petitioned the Federal Energy Regulatory Commission (FERC) to formally consult under section 7 of the Endangered Species Act with the National Marine Fisheries Service of the National Oceanic and Atmospheric Administration (NOAA)[1] regarding FERC's ongoing regulatory authority over hydropower operations affecting threatened and endangered anadromous[2] fish in the Snake River basin.  The petition has gone unanswered for more than six years.  Now petitioners American Rivers and Idaho Rivers United (collectively, petitioners) seek a writ of mandamus compelling a response, alleging that FERC's six-year delay is unreasonable under the Administrative Procedure Act (APA), 5 U.S.C. § 706(1).  For the reasons set forth below, we grant the writ and order FERC to respond to the petition within 45 days of the issuance of this opinion.

## I.

The Endangered Species Act (ESA or Act), 16 U.S.C. §§ 1531 *et seq.*, is generally regarded as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978); *see also Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1064 (D.C. Cir. 2003), *cert. denied*, 124 S. Ct. 1506 (2004).  Finding that various species of fish, wildlife and plants valuable to the health and welfare of the nation have become extinct or face extinction because of "economic growth and development untempered by adequate concern and conservation," 16 U.S.C. § 1531(a)(1)-(3), the

---

[1] The NOAA is an agency within the United States Department of Commerce.  *See, e.g., Conservation Law Found. v. Evans*, 360 F.3d 21, 23 n.1 (1st Cir. 2004).  The National Marine Fisheries Service (Service) is a part of NOAA.  *See id.*

[2] "Anadromous" fish, such as salmon, migrate upriver from the sea to breed in fresh water.  *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 76 (1993).

Congress enacted the ESA to provide a means for conserving endangered and threatened species as well as the ecosystems they depend on, *see id.* § 1531(b); *Rancho Viejo*, 323 F.3d at 1064.

The ESA confers on the United States Departments of the Interior (Interior) and of Commerce (Commerce) shared responsibilities for protecting threatened[3] or endangered[4] species of fish, wildlife and plants. *See* 16 U.S.C. § 1533(a). The Commerce Secretary has, in turn, delegated his authority to list threatened or endangered marine and anadromous species to the Service. *Id.* § 1533(a)(2)(A); 50 C.F.R. § 402.01(b); *see* 50 C.F.R. §§ 223.102 (threatened species), 224.101 (endangered species).

Section 7 of the ESA requires all federal agencies, "in consultation with and with the assistance of the [Commerce or Interior] Secretary," to further the ESA's purpose by "carrying out programs for the conservation" of listed species. 16 U.S.C. § 1536(a)(1). An agency must ensure that its actions, including licensures, are "not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical." *Id.* § 1536(a)(2); *see Rancho Viejo*, 323 F.3d at 1064. Upon determining that its activity "may affect listed [marine or anadromous] species or critical habitat," an agency must initiate formal consultation with the Service[5] by submitting a written request containing, *inter alia*, descriptions of

---

[3] A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

[4] A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

[5] If, following a biological assessment, *see* 50 C.F.R. § 402.12, or informal consultation with the Service, *see id.* § 402.13, the agency determines—and the Service concurs—that the contemplated action is "not likely to adversely affect any listed species or critical habitat" or "if a preliminary biological opinion, issued after early

the contemplated action and listed species or critical habitat that may be affected by it. 50 C.F.R. § 402.14(a), (c). Formal consultation ordinarily culminates with the Service's issuance of a biological opinion that makes a "jeopardy" or "no jeopardy" conclusion. *Id.* § 402.14(g)(4), (h)(3); *see* 16 U.S.C. § 1536(b)(4). If it determines that the action "is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," the opinion suggests "reasonable and prudent alternatives, if any," the agency can take to avoid violating section 7. 50 C.F.R. § 402.14(h)(3); *see* 16 U.S.C. § 1536(b)(3)(A). According to the Service's regulations, formal consultation must usually be concluded within 90 days. *See* 50 C.F.R. § 402.14(e).

In 1955 FERC's predecessor, the Federal Power Commission (Commission), granted a 50–year license to the Idaho Power Company (IPC) to construct, operate and maintain the Hells Canyon Complex, a hydropower project composed of three dams—Oxbow, low Hells Canyon and Brownlee—in the Hells Canyon area of the Snake River. *See Idaho Power Co.*, Opinion & Order, 14 F.P.C. 55 (Aug. 4, 1955), *reprinted in* Petitioners' Addendum (P.A.) 1, 20. The Commission recognized then that the project "would adversely affect the fish and wildlife resources of the area, and particularly the anadromous fish." P.A. 7. Because the project "would block the runs of anadromous fish," the Commission concluded that "some type of fish facilities would have to be provided for the protection of this resource." P.A. 17. Accordingly, to minimize the project's impact on the anadromous fish, the Commission required the IPC to construct and maintain "fish ladders, fish traps or other fish handling facilities or fish protective devices and provide fish hatchery facilities for the purpose of conserving the fishery resources." P.A. 21–22. The IPC's license also included a "re-opener" clause, provid-

consultation under § 402.11, is confirmed as the final biological opinion," formal consultation is not required. *Id.* § 402.14(b)(1)-(2). "Informal consultation" is an "optional process . . . designed to assist the [f]ederal agency in determining whether formal consultation or a conference is required." *Id.* § 402.13(a).

ing that the company must "comply with such reasonable modifications of the project structures and operation in the interest of fish life as may be prescribed hereafter by the Commission upon its own motion or upon the recommendation of the Secretary." P.A. 22.

It is not disputed that hydropower projects have contributed to declining populations of anadromous fish—namely, salmon and steelhead trout species—in the Snake River and the Columbia River basin. *See, e.g.*, *Endangered and Threatened Species; Proposed Endangered Status for Snake River Sockeye Salmon,* 56 Fed. Reg. 14,055, 14,058 (Apr. 5, 1991) (proposed rule ("[C]urrent annual salmon and steelhead production in the Columbia River Basin is more than 10 million fish below historical levels, with 8 million of this annual loss estimate attributable to hydropower development and operation.")). So far the Service has listed three Snake River anadromous fish species as endangered and one as threatened, each time listing hydropower development as a factor contributing to population decline.[6] In 1991 the Service listed the Snake River sockeye salmon as endangered. *See* 56 Fed. Reg. at 58,623. It listed two more species of salmon, the Snake River spring/summer chinook salmon and the Snake River fall chinook salmon, as threatened the following year[7] and as endangered two years later through an emergency

---

[6] *See Endangered and Threatened Species: Listing of Several Evolutionary Significant Units (ESUs) of West Coast Steelhead*, 62 Fed. Reg. 43,937, 43,950 (Aug. 18, 1997) (final rule); *Endangered and Threatened Wildlife and Plants; Emergency Reclassification of the Snake River Spring/Summer Chinook Salmon and the Snake River Fall Chinook Salmon From Threatened to Endangered Status*, 59 Fed. Reg. 54,840 (Nov. 2, 1994) (emergency rule); *Endangered and Threatened Species; Status of Snake River Spring/Summer Chinook Salmon and Snake River Fall Chinook Salmon*, 59 Fed. Reg. 42,529, 42,530 (Aug. 18, 1994) (emergency interim rule); *Endangered and Threatened Species; Endangered Status for Snake River Sockeye Salmon*, 56 Fed. Reg. 58,619, 58,622 (Nov. 20, 1991) (final rule).

[7] *See Endangered and Threatened Species; Threatened Status for Snake River Spring/Summer Chinook Salmon, Threatened*

rule.[8]  *See* 59 Fed. Reg. at 54,840;  59 Fed. Reg. at 42,531–32.  In 1993 the Service also designated an area including the Hells Canyon reach of the Snake River as critical habitat for these three salmon species.  *See Designated Critical Habitat; Snake River Sockeye Salmon, Snake River Spring/Summer Chinook Salmon, and Snake River Fall Chinook Salmon*, 58 Fed. Reg. 68,543, 68,546 (Dec. 28, 1993) (final rule).  And in 1997, the Service listed the Snake River population of west coast steelhead trout as threatened.  *See* 62 Fed. Reg. at 43,950.

Reacting to these developments, a coalition of environmental organizations (including petitioner American Rivers) requested FERC in November 1997 to initiate formal consultation with the Service regarding FERC's ongoing regulation of IPC's operation of the Hells Canyon Complex.[9]  *See* Petition to Initiate Consultation Under the Endangered Species Act at 1-17, *reprinted in* P.A. 40-56 [hereinafter 1997 petition].  The petition asked FERC to act within 30 days "[b]ecause time is running out for the endangered salmon."  P.A. 56.  The coalition further recited that it would consider FERC's failure to respond within 30 days a constructive denial of the petition and would file immediately for rehearing.  P.A. 56.

---

*Status for Snake River Fall Chinook Salmon*, 57 Fed. Reg. 14,653 (Apr. 22, 1992) (final rule).

[8] The emergency designation is no longer in effect.  *See* 16 U.S.C. § 1533(b)(7) (emergency regulation ceases to have force after 240 days);  50 C.F.R. § 424.20(a) (same);  *see also Endangered and Threatened Species; Withdrawal of Proposed Rule to List Snake River Spring/Summer Chinook Salmon and Fall Chinook Salmon as Endangered*, 63 Fed. Reg. 1807, 1811 (Jan. 12, 1998) (proposed rule; withdrawal (withdrawing proposed rule to reclassify Snake River spring/summer and fall chinook salmon as endangered)).

[9] The coalition filed its request pursuant to 18 C.F.R. § 385.207(a)(5), which provides that "[a] person must file a petition when seeking . . . [a]ny other action which is in the discretion of [FERC] and for which this chapter prescribes no other form of pleading."  *Id.*

When FERC failed to meet the deadline, the coalition reacted as promised. It notified FERC that it considered the agency's inaction a denial of the petition and requested rehearing. *See* Request for Rehearing of Constructive Order Denying Petition to Initiate Consultation Under the Endangered Species Act at 1-3, *reprinted in* P.A. 111-13. FERC subsequently denied rehearing, noting "[b]ecause there has been no order from which to seek rehearing, [the] rehearing request is premature and must be rejected." *Idaho Power Co.*, Order Rejecting Request for Rehearing, 82 FERC ¶ 61,-049 (Jan. 22, 1998) (footnote omitted). The coalition then petitioned the Ninth Circuit Court of Appeals for review of FERC's denial of the petition effected by its failure to act. *See American Rivers v. FERC*, 170 F.3d 896 (9th Cir. 1999). It met with no more success there. *Id.* at 897. The Ninth Circuit dismissed the petition for want of jurisdiction, explaining that "appellate jurisdiction is dependent on the issuance of an order by FERC" and the agency's "[m]ere inaction . . . cannot be transmuted by petitioners into an order rejecting their petition." *Id.*

Following the Ninth Circuit's decision, coalition members along with other groups have repeatedly requested FERC to either grant the 1997 petition and immediately initiate section 7 consultation or formally deny the petition.[10] More than six years later, FERC has yet to respond to the 1997 petition.

The petitioners now ask us to grant a writ of mandamus compelling FERC to act formally on the 1997 petition. We have jurisdiction to entertain the request in order to safeguard our prospective jurisdiction under the Federal Power Act, 16 U.S.C. § 825l(b). *See Telecomms. Research & Action*

---

[10] *See* Letter from Robert J. Masonis, American Rivers, to Spencer Abraham, Sec'y of Energy, et al. 6 (Aug. 28, 2002), *reprinted in* P.A. at 140; Letter from Pat Ford, Save Our *Wild* Salmon, et al., to Patrick Henry Wood III, Chairperson, FERC, & Kevin P. Madden, Office of General Counsel, FERC 4 (Nov. 1, 2001), *reprinted in* P.A. at 144; Letter from Aaron Courtney, Pacific Envtl. Advocacy Ctr., et al., to Spencer Abraham, Sec'y of Energy, et al. 6 (Apr. 19, 2001), *reprinted in* P.A. at 133.

*Center v. FCC*, 750 F.2d 70, 76 (D.C. Cir. 1984) ("Because the statutory obligation of a Court of Appeals to review on the merits may be defeated by an agency that fails to resolve disputes, a Circuit Court may resolve claims of unreasonable delay in order to protect its future jurisdiction.") [hereinafter *TRAC*].

## II.

Mandamus is an extraordinary remedy reserved for extraordinary circumstances. *See, e.g.*, *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999). An administrative agency's unreasonable delay presents such a circumstance because it signals the "breakdown of regulatory processes." *Cutler v. Hayes*, 818 F.2d 879, 897 n.156 (D.C. Cir. 1987). Accordingly, we will interfere with the normal progression of agency proceedings to correct "transparent violations of a clear duty to act," *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000), because "[i]t is obvious that the benefits of agency expertise and creation of a record will not be realized if the agency never takes action." *TRAC*, 750 F.2d at 79. In considering a charge of unreasonable delay, however, we must satisfy ourselves that the agency has a duty to act and that it has "unreasonably delayed" in discharging that duty. 5 U.S.C. § 706(1); *see id.* § 555(b); *In re Bluewater Network*, 234 F.3d at 1315. Although our test to determine whether to address an alleged unreasonable delay is "hardly ironclad," *TRAC*, 750 F.2d at 80, we are guided by the standard announced in *TRAC*:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed

> action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d at 549 (quoting *TRAC*, 750 F.2d at 80).

Rather than attempting to demonstrate the reasonableness of its more than six-year delay, FERC defends its inaction indirectly with arguments that proceed along two related and, at times, conflicting fronts. FERC first asserts that it is not obligated to address the 1997 petition at all. In FERC's view, simply filing a petition seeking agency action does not, by itself, require FERC to respond to it. Moreover, according to FERC, neither a re-opener clause in a hydropower licensee's license nor the Service's listing of endangered or threatened species or designation of critical habitat requires it to initiate formal consultation under section 7 of the ESA. In this regard, FERC maintains that "the ESA prerequisite for instituting formal consultation has not yet been met and the precise obligations of FERC in these circumstances are far from clear under the statute or regulations." Respondent's Br. at 17. Both of FERC's assertions are founded on fundamental misunderstandings; the former of the law, the latter of the legal issue before us.

FERC's insistence that it is not obligated to address a petition filed under one of its own regulations allowing requests for discretionary action, *see* 18 C.F.R. § 385.207(a)(5), is without merit. Under the APA a federal agency is obligated to "conclude a matter" presented to it "within a reasonable time," 5 U.S.C. § 555(b), and a reviewing court may "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1); *see In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992) (per curiam). FERC may not wish to respond to the 1997 petition but any person aggrieved by a FERC action—including a failure to act—is entitled to judicial review under the Federal Power Act, *see* 16 U.S.C.

§ 825l(b). Indeed, the primary purpose of the writ in circumstances like these is to ensure that an agency does not thwart our jurisdiction by withholding a reviewable decision. *See TRAC*, 750 F.2d at 76.

FERC's assertions that it is not obligated to initiate formal consultation under section 7 either by virtue of the re-opener clause in IPC's license or based on the Service's ESA actions are beside the point. FERC is obligated *under the APA* to respond to the 1997 petition. Moreover, these contentions go not to the reasonableness of FERC's delay but to the merits of the petition itself. We are not concerned here with what answer FERC might ultimately give the petitioners; rather, we are reviewing its failure to give them *any* answer for more than six years.

FERC's second front involves contentions that again, in one way or another, address the merits of the 1997 petition. FERC contends that, given its involvement in (or notice of) ongoing efforts to resolve complex litigation regarding Snake River water rights, "it is difficult to see what more FERC could do" and that "[n]othing more is or can be required." Respondent's Br. at 14, 15. FERC also points out that "interim measures[ ] agreed to by the affected agencies and parties" address the Service's listing of the salmon and steelhead species until the water rights litigation is resolved. Respondent's Br. at 18. FERC further explains that, because resolution of the water rights litigation will bear on the section 7 formal consultation regarding the operation of the Hells Canyon Complex, the Service has "counsel[led] forbearance" and asked FERC to "suspend information gathering until negotiations to settle that litigation have run their course." Respondent's Br. at 18.

In a similar vein, FERC stated during oral argument that it had already "done what was requested in the 1997 petition." Oral Arg. Tr. at 11. FERC's assertion that it responded to the 1997 petition by doing what the petition requested runs counter to its position on brief and discussed above. More significantly, FERC's resort to certain record items does not

constitute an unequivocal—or even coherent—response to the 1997 petition.[11]

While FERC makes various attempts to rationalize its delay, none of its reasons comports with the specific considerations outlined in *TRAC*. *See TRAC*, 750 F.2d at 80. There is "no *per se* rule as to how long is too long" to wait for agency action, *In re Int'l Chem. Workers Union*, 958 F.2d at 1149, but a reasonable time for agency action is typically counted in weeks or months, not years. *See Midwest Gas Users Ass'n v. FERC*, 833 F.2d 341, 359 (D.C. Cir. 1987) ("[T]his court has stated generally that a reasonable time for an agency decision could encompass 'months, occasionally a year or two, but not several years or a decade.'" (quoting *MCI Telecomms. Corp. v. FCC*, 627 F.2d 322, 340 (D.C. Cir. 1980))). FERC's six-year-plus delay is nothing less than egregious.[12]

Not only has FERC neglected a petition seeking action under a law designed to "halt and reverse the trend toward

---

[11] *Compare* Letter from J. Mark Robinson, Director, Office of Energy Projects, FERC, to Robert Lohn, Regional Administrator, Service 1 (Oct. 25, 2002) ("I'm requesting formal consultation with your office, pursuant to section 7 of the [ESA], with respect to the impacts of the Hells Canyon Complex Project . . . on threatened or endangered species and/or critical habitat."), *reprinted in* P.A. 146, *with* Letter from James C. Tucker, IPC, to J. Mark Robinson, Director, Office of Energy Projects, FERC 1 (Dec. 2, 2002) ("We were advised [during a meeting on November 6, 2002] that FERC was not initiating § 7(a)(2) consultation. . . ."), *reprinted in* P.A. 147.

[12] We have questioned a similar delay, *see Pub. Citizen Health Research Group v. Brock*, 823 F.2d 626, 628 (D.C. Cir. 1987) (six-year delay "tread[ed] at the very lip of the abyss of unreasonable delay"), and shorter ones too, *see, e.g., Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Bd.*, 750 F.2d 81, 86 (D.C. Cir. 1984) (five-year delay unreasonable); *Pub. Citizen Health Research Group v. Auchter*, 702 F.2d 1150, 1157–59 (D.C. Cir. 1983) (per curiam) (three-year delay unreasonable); *MCI Telecomms. Corp.*, 627 F.2d at 324–25, 338–42 (four-year delay unreasonable).

species extinction, whatever the cost,"[13] but its dilatoriness is apparently—it offers nothing to the contrary—uncharacteristic of the relatively swift treatment it routinely gives similar petitions.[14] Further, FERC offers no "plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources." *Cutler*, 818 F.2d at 898. While FERC vacillates between claiming that it is not obligated to respond to the 1997 petition and asserting it can do no more, it has in no way indicated that any practical impediments have prevented a response or that any "agency activities of a higher or competing priority" have required its attention.[15] *See In re*

---

[13] *Tennessee Valley Auth.*, 437 U.S. at 184; *see also* 16 U.S.C. §§ 1531(b), 1536.

[14] *See Puget Sound Energy, Inc.*, Order Dismissing Petition, 95 FERC ¶ 61,015 (Apr. 2, 2001) (dismissing petition for formal consultation within three months), *available at* 2001 WL 477657; *Phelps-Dodge Morenci, Inc.*, Order Denying Petition, 94 FERC ¶ 61,202 (Feb. 23, 2001) (denying petition for formal consultation in less than two years), *available at* 2001 WL 275411; *Montana Power Co.*, Order Dismissing Petition, 83 FERC ¶ 61,290 (June 12, 1998) (dismissing petition seeking damages and restitution within one month), *available at* 1998 WL 308087; *South Suburban Citizens Opposed to Polluting Our Env't v. Chewton Glen Energy–Ford Heights, LLC*, Order Dismissing Petition for Declaratory Order, 79 FERC ¶ 61,291 (June 2, 1997) (dismissing petition for declaratory order within four months), *available at* 1997 WL 290241; *Modesto Irrigation Dist., Turlock Irrigation Dist., City and County of San Francisco, CA*, Order Dismissing Petition, 35 FERC ¶ 61,356 (June 19, 1986) (dismissing petition requesting permit cancellation in less than two years), *available at* 1986 WL 77869.

[15] Under the final *TRAC* criterion, "[t]he court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'" 750 F.2d at 80 (quoting *Pub. Citizen Health Research Group v. FDA*, 740 F.2d 21, 34 (D.C. Cir. 1984)). Nonetheless, FERC candidly admits its disdain for the petitioners' effort to seek review of the agency's inaction. *See* Respondent's Br. at 14 (asserting that petitioners' "call for formal consultation appears to have the sole function of obtaining a FERC order [they] can appeal").

*United Mine Workers of Am. Int'l Union*, 190 F.3d at 549.

\* \* \*

The petitioners are entitled to an end to FERC's marathon round of administrative keep-away and soon. Accordingly, we hereby direct FERC to issue a judicially reviewable response to the 1997 petition within 45 days from the date of the issuance of this opinion.

*So ordered.*