# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 5, 2008          Decided July 8, 2008

No. 07-1446

IN RE: CORE COMMUNICATIONS, INC.,
PETITIONER

On Petition for Writ of Mandamus
to the Federal Communications Commission

*Michael B. Hazzard* argued the cause for petitioner. With him on the briefs was *Joseph P. Bowser*.

*Joseph R. Palmore*, Deputy General Counsel, argued the cause for respondent. With him on the brief were *Matthew B. Berry*, General Counsel, *Richard K. Welch*, Acting Deputy Associate General Counsel, and *Nandan M. Joshi*, Counsel.

Before: TATEL, GARLAND, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

Concurring opinion filed by *Circuit Judge* GRIFFITH.

GARLAND, *Circuit Judge*: The Federal Communications Commission (FCC) has twice failed to articulate a valid legal justification for its rules governing intercarrier compensation for telecommunications traffic bound for Internet service providers (ISPs). In March 2000, this court vacated and remanded the

Commission's first attempt at a justification. In May 2002, we rejected its second attempt, in that case remanding without vacating because we thought there was a "non-trivial likelihood" the Commission would be able to state a valid legal basis for its rule.

No such justification has been forthcoming. Core Communications, Inc., which is injured by the FCC's rules, has filed a petition for a writ of mandamus, seeking an order compelling the Commission to explain the legal authority upon which the rules are based, on pain of vacatur if it fails to do so within a fixed time. This is Core's second petition seeking such relief. We dismissed its first in 2005, "without prejudice to refiling in the event of significant additional delay." That delay has now come to pass. It has been three years since we dismissed Core's first petition and six years since we remanded the case to the FCC to do nothing more than state the legal justification for its rules. At this point, the FCC's delay in responding to our remand is egregious.

We therefore grant the writ of mandamus sought by Core and direct the FCC to explain the legal basis for its ISP-bound compensation rules within six months of the date of the oral argument in this case. There will be no extensions of that deadline. The rules will be vacated on the day after the deadline, unless the court is notified that the Commission has complied with our direction.

I

Our opinion in *In re Core Communications, Inc.*, 455 F.3d 267 (D.C. Cir. 2006), sets forth much of the background necessary to understand how this case arrived at its current juncture, and we therefore borrow liberally from that exposition. As we explained in *Core*, before high-speed broadband

connections (such as cable modem and digital subscriber line (DSL) service) became widely available, consumers generally gained access to the Internet through "dial-up" connections provided by local telephone companies. Under the dial-up method, a consumer uses a line provided by a local exchange carrier (LEC) -- usually an incumbent local exchange carrier (ILEC) -- to dial the local telephone number of an Internet service provider (ISP), which then connects the call to the Internet. Typically, the ISP does not subscribe to the ILEC, but instead subscribes to another LEC -- a competitive local exchange carrier (CLEC) -- that interconnects with the incumbent. Accordingly, a consumer who dials up to the Internet usually obligates an originating ILEC to transfer the call to a CLEC, which then delivers the call to the ISP. Core is a CLEC. *See id*. at 270.

How this call is paid for is at the center of Core's dispute with the FCC. Section 251(b)(5) of the Communications Act of 1934, as amended by the Telecommunications Act of 1996, requires LECs to "establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). Under a reciprocal compensation arrangement, "[w]hen a customer of carrier A makes a local call to a customer of carrier B, and carrier B uses its facilities to connect, or 'terminate,' that call to its own customer, the 'originating' carrier A is ordinarily required to compensate the 'terminating' carrier B for the use of carrier B's facilities." *SBC Inc. v. FCC*, 414 F.3d 486, 490 (3d Cir. 2005) (citing *Global NAPs, Inc. v. FCC*, 247 F.3d 252, 254 (D.C. Cir. 2001)); *see In re Core*, 455 F.3d at 270.

If ISP-bound traffic were governed by § 251(b)(5), reciprocal compensation arrangements would be required for the ILEC-to-CLEC hand-off just described, and ILECs would be required to compensate CLECs -- like Core -- for completing

their customers' calls to ISPs. In 1996, however, the FCC construed the "reciprocal compensation arrangements" provision of § 251(b)(5) to "apply only to traffic that originates and terminates within a local area." *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd 15,499, 16,013, ¶ 1034, 1996 WL 452885 (1996). And in its 1999 *Declaratory Ruling*, the Commission concluded that dial-up calls to an ISP for connection to the Internet are non-local, and thus that § 251(b)(5) is inapplicable. *See Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Inter-Carrier Compensation for ISP-Bound Traffic*, 14 FCC Rcd 3689, 1999 WL 98037 (1999) ("*Declaratory Ruling*"). Instead, the FCC concluded that ISP-bound calls constitute interstate traffic, subject to FCC jurisdiction under § 201 of the Act.[1] *See Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic*, 16 FCC Rcd 9151, 9152, ¶ 1, 2001 WL 455869 (2001) ("*ISP Remand Order*") (construing the *Declaratory Ruling*).

---

[1]Section 201 provides, in relevant part:

> (a) It shall be the duty of every common carrier engaged in interstate . . . communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission . . . finds such action necessary or desirable in the public interest, to establish . . . charges applicable thereto and the divisions of such charges . . . .

> (b) All charges . . . for and in connection with such communication service, shall be just and reasonable . . . .

47 U.S.C. § 201.

In March 2000, this court held that the Commission had inadequately explained its determination that ISP-bound traffic is non-local. *See Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1, 7-8 (D.C. Cir. 2000). The FCC, we said, had failed to "provide an explanation why th[e] [end-to-end] inquiry is relevant to discerning whether a call to an ISP should fit within the local call model . . . or the long-distance model." *Id*. at 5. We vacated and remanded the *Declaratory Ruling*, directing the FCC to justify its determination. *Id*. at 9.

In 2001, the FCC responded to our decision in *Bell Atlantic* with the *ISP Remand Order*. Once again, the Commission concluded that calls delivered to ISPs are not subject to the reciprocal compensation obligations of § 251(b)(5). *See ISP Remand Order*, 16 FCC Rcd at 9154, ¶ 3. But this time, rather than base its conclusion on a determination that ISP-bound calls are non-local and hence not subject to § 251(b)(5), the Commission relied on a different statutory section, 47 U.S.C. § 251(g).[2] *See id*. at 9153, ¶ 1. According to the FCC, § 251(g)

---

[2]Section 251(g) provides, in relevant part:

> On and after [the date of enactment of the Telecommunications Act of 1996], each local exchange carrier . . . shall provide exchange access, information access, and exchange services for such access to interexchange carriers and information service providers in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (including receipt of compensation) that apply to such carrier on the date immediately preceding [the date of enactment] under any . . . regulation, order, or policy of the Commission, until such restrictions and obligations are explicitly superseded by regulations prescribed by the Commission after [the date of enactment].

was intended to exclude the kinds of traffic enumerated in that subsection, specifically "exchange access, information access, and exchange services for such access," from the reciprocal compensation requirement of § 251(b)(5). *Id*. at 9166-67, ¶ 34 (quoting § 251(g)). And it found that calls made to ISPs located within the caller's local calling area fall within those enumerated categories -- specifically, that they constitute "information access." *Id*. at 9171, ¶ 42. Those calls, the FCC concluded, are thus not subject to § 251(b)(5), but are instead subject to the FCC's regulatory authority under § 201. *See id*. at 9152-53, ¶ 1; *id*. at 9165, ¶ 30; *id*. at 9175-81, ¶¶ 52-65.

The FCC next sought "to establish an appropriate cost recovery mechanism for delivery of this [ISP-bound] traffic." *Id*. at 9154, ¶ 4. The Commission concluded that "the existing intercarrier compensation mechanism . . . , in which the originating carrier pays the carrier that serves the ISP, has created opportunities for regulatory arbitrage and distorted the economic incentives related to competitive entry into the local exchange and exchange access markets." *Id*. at 9153, ¶ 2. And it announced that it was issuing -- in tandem with its *ISP Remand Order* -- a notice of proposed rulemaking to consider whether the Commission should replace existing intercarrier compensation schemes with a "bill-and-keep" regime. *Id*.; *see Notice of Proposed Rulemaking, Developing a Unified Intercarrier Compensation Regime*, 16 FCC Rcd 9610, 2001 WL 455872 (2001) ("NPRM"). Under such a regime, "neither of two interconnecting networks charges the other for terminating traffic that originates on the other network. Instead, each network recovers [its costs] from its own end-users." *ISP Remand Order*, 16 FCC Rcd at 9153 n.6. Thus, in the typical scenario discussed above, the originating ILEC would recover its costs from the customer who initiated the call, while the

47 U.S.C. § 251(g).

CLEC would recover its costs from the ISP customer to which it delivered the call.

Although the FCC issued the NPRM looking toward a bill-and-keep regime, the Commission nonetheless deemed it "prudent" not to switch immediately "to a new compensation regime that would upset the legitimate business expectations of carriers and their customers." *Id*. at 9186, ¶ 77. It therefore adopted "an interim intercarrier compensation regime for ISP-bound traffic that serves to limit, if not end, the opportunity for regulatory arbitrage, while avoiding a market-disruptive 'flash cut' to a pure bill and keep regime." *Id*. at 9186-87, ¶ 77. The interim regime, the FCC said, "will govern intercarrier compensation for ISP-bound traffic until we have resolved the issues raised in the intercarrier compensation *NPRM*." *Id*. at 9187, ¶ 77. According to the FCC, this would be "a *three-year* interim intercarrier compensation mechanism for the exchange of ISP-bound traffic." *Id*. at 9199, ¶ 98 (emphasis added).

The FCC's interim regime has four provisions particularly relevant to Core. Of these, the most important are the "rate caps," which establish a gradually declining maximum rate that a carrier (typically, a CLEC) can charge another carrier (typically, an ILEC) for delivering a call to an ISP. *Id*. at 9187, ¶ 78. As an adjunct to the rate caps, the Commission also established a "mirroring rule," which provides that the rate caps on ISP-bound traffic apply only if the ILEC also offers to charge the CLEC the same capped rate to terminate local traffic that originates on the CLEC's network. *Id*. at 9193-94, ¶ 89. The other two provisions are "growth caps," which impose a limit on the total number of ISP-bound minutes for which a carrier can receive intercarrier compensation, and a "new markets rule," which denies intercarrier compensation for ISP-bound traffic in markets where the carrier was "not exchanging traffic pursuant to [an] interconnection agreement[] prior to adoption" of the

Order. *Id*. at 9191, ¶ 86; *id*. at 9188-89, ¶ 81. *See generally In re Core*, 455 F.3d at 273-74.

In *WorldCom, Inc. v. FCC*, 288 F.3d 429 (D.C. Cir. 2002), we reviewed the *ISP Remand Order*. Our opinion, issued on May 3, 2002, rejected the FCC's conclusion that § 251(g) authorizes it to carve out ISP-bound calls from the requirement of § 251(b)(5). *See id*. at 430. "Because that section is worded simply as a transitional device," we held, the FCC cannot rely on § 251(g) to exclude ISP-bound calls from the scope of § 251(b)(5). *Id*. Section 251(g), we said "does not provide a basis for the Commission's action." *Id*. at 434.

This time, however, we did not vacate the FCC's order. Nor did we "address petitioners' attacks on various interim provisions devised by the Commission." *Id*. at 430. Instead, because we thought that there might "well be other legal bases for adopting the rules chosen by the Commission for compensation between the originating and the terminating LECs in calls to ISPs," we merely remanded to the Commission for further proceedings, thus leaving the interim rules in effect. *Id*.; *see id*. at 434.

The Telecommunications Act of 1996 authorizes any telecommunications carrier to petition the FCC to "forbear from applying any regulation or any provision" of the Act. 47 U.S.C. § 160(a). On July 14, 2003, Core filed a petition asking the FCC to forbear from applying the four interim provisions of the *ISP Remand Order*. On October 8, 2004, the Commission granted Core's petition in part and denied it in part. The FCC granted the request to forbear from enforcing the growth caps and new markets rule, but denied Core's petition with respect to the rate caps and mirroring rule. Core then sought review in this court, asking us to reverse the FCC's partial denial of its petition for

forbearance. We denied Core's request and upheld the Commission's decision. *In re Core*, 455 F.3d at 270, 275-80.[3]

Meanwhile, the FCC still had not responded to the *WorldCom* remand. In June 2004, after two years had passed without a response, Core petitioned this court for a writ of mandamus. In its August 2004 response, the FCC argued that mandamus was premature because "Commission staff recently completed and forwarded to the Chairman of the FCC a draft order addressing the *WorldCom* remand." Resp. of FCC to Pet. for Writ of Mandamus at 1 (Aug. 19, 2004). It further argued that the delay was "not as long as the egregious delays that historically have been found to warrant mandamus relief." *Id.* at 11 (internal quotation marks omitted). "When this Court has found the mandamus remedy to be appropriate," the FCC stated, "it generally has been confronted with delays of at least three years." *Id.*

Based on this response, we deferred consideration of the mandamus petition and directed the FCC to advise us, at 90-day intervals, "of its progress in responding to the remand in *WorldCom*." *In re Core Commc'ns, Inc.*, No. 04-1179 (D.C. Cir. Nov. 22, 2004). On March 4, 2005, FCC counsel reported that the Commission had just released a "Further Notice of Proposed Rulemaking [FNPRM] in the *Intercarrier Compensation* docket in which it has been seeking, among other things, to adopt permanent rules to succeed the interim intercarrier compensation regime for Internet-bound traffic that this Court reviewed in *WorldCom, Inc. v. FCC*." Supp. Status Report at 1 (Mar. 4, 2005). Based on the FCC's representations regarding the draft order and FNPRM, we denied Core's

---

[3]In the same opinion, we also denied a request by a group of ILECs to reverse the FCC's partial grant of Core's forbearance petition. *In re Core*, 455 F.3d at 270, 280-83.

mandamus petition in May 2005, "without prejudice to refiling in the event of significant additional delay." *In re Core Commc'ns, Inc.*, No. 04-1179 (D.C. Cir. May 24, 2005).

A year later, in April 2006, there was no word from the FCC on the fate of the draft *WorldCom* order and no release of permanent rules in response to the FNPRM. Core then filed a second forbearance petition with the Commission, again asking, among other things, for the FCC to forbear from applying the (remaining) interim rules that carve out ISP-bound traffic from the obligation to pay reciprocal compensation. The Commission rejected Core's petition, *Petition of Core Communications, Inc. for Forbearance from Sections 251(g) and 254(g) of the Communications Act and Implementing Rules*, 22 FCC Rcd 14,118, 2007 WL 2159638 (2007),[4] and Core has appealed that decision. The case is currently on this circuit's docket.

In October 2007, Core filed its second mandamus petition, which is now before us. It asks that we compel the FCC to enter an order, within 60 days, responding to our *WorldCom* remand with an explanation of the legal basis for the rules that exclude ISP-bound calls from the reciprocal compensation requirement of § 251(b)(5). Core further requests that we vacate those rules if the FCC does not issue such an order.

---

[4]The FCC also disagreed with Core's contention that forbearance would return ISP-bound traffic to a reciprocal compensation regime, stating that, if "the Commission were to forbear from the rate regulation preserved by section 251(g), there would be no rate regulation governing the exchange of traffic currently subject to the access charge regime." 22 FCC Rcd at 14,126, ¶ 14.

11

II

Core seeks a writ of mandamus under the All Writs Act, 28 U.S.C. § 1651(a), to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1) (Administrative Procedure Act). This court's jurisdiction and authority to grant that request are undisputed.[5] Our consideration of any mandamus petition "starts from the premise that issuance of the writ is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act." *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000). There is, of course, no doubt that the FCC has a "clear duty" to respond to our *WorldCom* remand. "In the case of agency inaction," however, "we not only must satisfy ourselves that there indeed exists such a duty, but that the agency has 'unreasonably delayed' the contemplated action." *Id*. (quoting 5 U.S.C. § 706(1)). The central question in evaluating "a claim of unreasonable delay" is "whether the agency's delay is so egregious as to warrant mandamus." *Telecommunications Research & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 79 (D.C. Cir. 1984). We consider that question below.

---

[5]*See Telecommunications Research & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 75 (D.C. Cir. 1984) ("[T]he statutory commitment of review of FCC action to the Court of Appeals, read in conjunction with the All Writs Act, affords this court jurisdiction over claims of unreasonable Commission delay." (citation omitted)); *id*. at 79 ("Congress has instructed statutory review courts to compel agency action that has been unreasonably delayed. 5 U.S.C. § 706(1)."); *see also In re American Rivers & Idaho Rivers United*, 372 F.3d 413, 414 (D.C. Cir. 2004); *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000); *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999). *See generally* 28 U.S.C. § 1651(a) ("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.").

A

"There is no per se rule as to how long is too long to wait for agency action." *In re American Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004). In *TRAC*, we outlined six factors relevant to the analysis. We cautioned that those factors are not "ironclad," but rather are intended to provide "useful guidance in assessing claims of agency delay." *TRAC*, 750 F.2d at 80. The first and most important factor is that "the time agencies take to make decisions must be governed by a 'rule of reason.'" *Id.* The remaining five are:

> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (quoting *TRAC*, 750 F.2d at 80).

Both Core and the FCC dutifully address the six *TRAC* factors individually, each party drawing different conclusions. *See* Pet'r Br. 19-27; FCC Br. 13-23. But while those factors are not unimportant here, we must begin by noting that the procedural posture of this case is different from that of most of

this circuit's unreasonable delay cases. *TRAC*, and all of the cases cited by the parties that employ its methodology, involved delay by agencies in concluding their own rulemakings or in responding to requests by private parties to take administrative action.[6] The problem that confronts us here is different. In this case, we are faced with the agency's failure -- for six years -- to respond to our own remand. In so doing, the agency has effectively nullified our determination that its interim rules are invalid, because our remand without vacatur left those rules in place. Moreover, until the FCC states its explanation for its interim rules in a final order, Core cannot mount a challenge to those rules. In this way, the FCC insulates its nullification of our decision from further review. But a federal court has authority to issue a writ of mandamus to "prevent the frustration of orders previously issued." *Potomac Elec. Power Co. v. ICC* ("*PEPCO*"), 702 F.2d 1026, 1032 (D.C. Cir. 1983). And "[b]ecause the statutory obligation of a Court of Appeals to review on the merits may be defeated by an agency that fails to resolve disputes, a Circuit Court may resolve claims of unreasonable delay in order to protect its future jurisdiction." *TRAC*, 750 F.2d at 76; *see American Rivers*, 372 F.3d at 419 ("[T]he primary purpose of the writ in circumstances like these is to ensure that an agency does not thwart [the court's] jurisdiction by withholding a reviewable decision.").

Two precedents are most relevant to our disposition of this case. The first is *PEPCO*, 702 F.2d 1026, a pre-*TRAC* case in which we held that the ICC had unreasonably delayed the

---

[6]*See, e.g.*, *American Rivers*, 372 F.3d 413; *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094 (D.C. Cir. 2003); *United Mine Workers*, 190 F.3d 545; *Action on Smoking & Health v. Department of Labor*, 100 F.3d 991 (D.C. Cir. 1996); *In re Barr Labs.*, 930 F.2d 72 (D.C. Cir. 1991); *In re Monroe Commc'ns Corp.*, 840 F.2d 942 (D.C. Cir. 1988).

disposition of PEPCO's challenge to the lawfulness of railroad freight charges. Five years earlier we had remanded PEPCO's challenge to the Commission for further consideration, in response to which the Commission reopened the proceedings, then began an entirely new hearing, and then reopened the proceedings again. *Id*. at 1029-30. Relying on "our inherent power to construe the mandate of our earlier decision," we reviewed the "question whether PEPCO's right to a timely decision from the Commission ha[d] been violated." *Id*. at 1032. We concluded that it had. Noting that "[a]gain and again the Commission has promised to expedite this matter, but without delivering," we ordered the Commission to reach a final decision on PEPCO's challenge within 60 days. *Id*. at 1035.

The second precedent is *Radio-Television News Directors Ass'n v. FCC*, 229 F.3d 269 (D.C. Cir. 2000), a case that cites *TRAC* but does not address its six factors individually. *See id*. at 272. *Radio-Television* began as a challenge to the FCC's personal attack and political editorial rules, which had been the subject of a petition to rescind since 1980. In 1997, the Commission decided (by an equally divided vote) not to repeal the rules, but it offered no affirmative justification for that decision. On appeal in 1999, we held that, "[w]ithout a clear explanation for the rules, the court is not in a position to review whether they continue to serve the public interest." *Radio-Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 875 (D.C. Cir. 1999). "Accordingly, rather than enjoining enforcement of existing rules that the FCC might be able to justify," we "remand[ed] the case for the FCC to further explain its decision not to repeal or modify them." *Id*. That, we said, would put the court "in a position to test the FCC's rationale" should "a further challenge be made to the FCC's decision on remand." *Id*.

Nine months later, the FCC had taken no action, and the petitioners filed a petition for mandamus. The FCC responded

by issuing an order temporarily suspending the rules for 60 days. That order, we held, was "not responsive to the court's remand." *Radio-Television*, 229 F.3d at 271. It did not provide a justification for the rules, and "simply ha[d] the effect of further postponing a final decision by the Commission." *Id.* Noting that "[t]he court has afforded repeated opportunities for the Commission to take final action," and that "[d]espite its filings suggesting to the court that something would happen, the Commission, once again, has done nothing to cure the deficiencies of which it has been long aware," we issued "a writ of mandamus directing the Commission immediately to repeal the personal attack and political editorial rules." *Id.* at 272.

The similarities between *PEPCO* and *Radio-Television* on the one hand, and this case on the other, are clear. It is now seven years since the FCC put in place the interim rules that it said would last only three. It is now six years since we held, for the second time, that the FCC's legal justification for the rules was invalid and remanded for the agency to provide a valid justification. During all this time, the FCC has proceeded -- as it did in *PEPCO* and *Radio-Television* -- to enforce rules for which it has articulated no lawful basis. In *PEPCO*, we issued the writ when the ICC failed to respond to our remand within five years. In *Radio-Television*, we did so when the FCC failed to respond within just nine months.[7]

---

[7]Although our remand in *Radio-Television* had expressly stated that "the FCC need act expeditiously," 184 F.3d at 889, timeliness is implicit in every remand by this court, *see PEPCO*, 702 F.2d at 1034 ("[O]ur remand in the earlier appeal to this court implicitly included the understanding that the Commission would respond to our mandate in a timely manner."); *cf.* 47 U.S.C. § 402(h) (providing that, on remand from this court, "it shall be the duty of the Commission . . . to *forthwith give effect*" to the judgment of the court (emphasis added)).

As noted above, the first *TRAC* factor is that "the time agencies take to make decisions must be governed by a 'rule of reason.'" *TRAC*, 750 F.2d at 80. *PEPCO* and *Radio-Television* make clear that the FCC's delay in responding to our *WorldCom* remand is anything but reasonable, and that factor is decisive here. Indeed, we have several times found similar delays unreasonable even when the requests for action came from private parties. For example, in *MCI Telecommunications Corp. v. FCC*, 627 F.2d 322 (D.C. Cir. 1980), from which *TRAC* derived its "rule of reason" standard, we found the FCC's four-year delay in determining a just and reasonable tariff to be unreasonable. *Id*. at 325. And in *American Rivers*, we found that FERC's delay of six years in responding to a petition was "nothing less than egregious." 372 F.3d at 419.[8]

In the words of the fifth *TRAC* factor, it is also clear that Core has been "prejudiced by delay." *TRAC*, 750 F.2d at 80. For seven years -- since the *ISP Remand Order* established the interim rules -- Core has been subject to rate caps that it estimates "result in rates 300-400% lower than other § 251(b)(5) intercarrier compensation rates." Pet'r Br. 14. It has been subject to those caps notwithstanding that this court has found invalid the only statutory basis the FCC has articulated to support them. The FCC's brief suggests that Core's concerns have less urgency because "[i]ncreasingly, end users are not using dial-up connections to connect to the Internet, but, rather, cable modem, DSL, and other broadband platforms." FCC Br. 17 (emphasis omitted). Perhaps this makes Core's concerns less urgent to the FCC, but it makes them no less urgent to Core. As discussed in Part II.B below, Core is seeking relief not only for

---

[8] *See also Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Bd.*, 750 F.2d 81, 86 (D.C. Cir. 1984) (finding a five-year delay unreasonable); *Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150, 1157-59 (D.C. Cir. 1983) (finding a three-year delay unreasonable).

the future, but for the period since 2001, when dial-up access to the Internet was not yet as outmoded as the slide rule.

The FCC urges us to stay our hand until the conclusion of its ongoing rulemaking proceeding "in which it is considering comprehensive, industry-wide reforms to the system of intercarrier compensation." FCC Br. 1. "[T]his broad rulemaking," we are told, "will, among other things, address the issues raised by this Court's remand in WorldCom, Inc. v. FCC." *Id*. Indeed, counsel suggests that the Commission is on the brink of concluding its rulemaking and responding to our remand. We have heard this refrain before.

Seven years ago, in April 2001, the Commission issued an NPRM that announced its intention to promulgate a comprehensive regime to supersede what it said would be only a "three-year" interim regime under the *ISP Remand Order*. *See* NPRM, 16 FCC Rcd 9610. In August 2004, in response to Core's first mandamus petition, the FCC advised us that "Commission staff recently completed and forwarded to the Chairman of the FCC a draft order addressing the *WorldCom* remand." Resp. of FCC to Pet. for Writ of Mandamus at 1 (Aug. 19, 2004). In light of this advice, we deferred consideration of the petition and ordered status reports. In its March 2005 status report, the FCC further advised that it had just issued a "Further Notice of Proposed Rulemaking in the *Intercarrier Compensation* docket in which it has been seeking, among other things, to adopt permanent rules to succeed the interim intercarrier compensation regime for Internet-bound traffic that this Court reviewed in *WorldCom, Inc. v. FCC*." Supp. Status Report at 1 (Mar. 4, 2005). On further inspection, it appears that the FNPRM in question contained only a single, footnote reference to the *WorldCom* order: "In this proceeding, the Commission *hopes* to address the compensation regime for all types of traffic, including ISP-bound traffic." *Further Notice of*

*Proposed Rulemaking, Developing a Unified Intercarrier Compensation Regime*, 20 FCC Rcd 4685, 4694 n.48, 2005 WL 495087 (2005) (emphasis added). Nonetheless, on that hope we denied the petition, "without prejudice to refiling in the event of significant additional delay." *In re Core*, No. 04-1179 (May 24, 2005).

More than three years later, when "significant additional delay" had indeed transpired, Core filed the instant petition. Then, one business day before we heard oral argument in this case, FCC counsel informed us that the Commission had issued an order adopting an interim cap on the support that certain telecommunications carriers can receive from the Universal Service Fund. Quoting a press release from the FCC's Wireline Competition Bureau calling the order "'a crucial first step' toward 'comprehensive reform' not only of Universal Service but also of intercarrier compensation," counsel stated: "Now that the Commission has capped payments from the fund, the Commission can 'move forward expeditiously on comprehensive reform' of intercarrier compensation." FCC Rule 28(j) Letter, May 2, 2008 (quoting Press Release, FCC, Interim Cap Clears Path for Comprehensive Reform (May 2, 2008)). But the Commission order that the press release touts does not mention comprehensive reform of *intercarrier compensation*, let alone the specific problem of ISP-bound traffic. Rather, it refers only to "comprehensive reform of high-cost universal service support." *High-Cost Universal Service Support*, 45 Commc'ns Reg. (P & F) 1, 3, ¶ 4, 2008 WL 1930572 (2008). And in any event, it is now far too late for the Commission to be taking a "first step," even if it is a "crucial" one.

On the day of oral argument, the FCC made yet another last-minute declaration of imminent action. Counsel informed the court -- for the first time -- that the Chairman of the FCC had

authorized him to represent that "the Chairman fully intends to do everything he can to respond to the *WorldCom* remand within six months." Oral Arg. Recording at 22:18-23:03. The Chairman will attempt, counsel advised, to "achieve broad-based comprehensive intercarrier compensation reform within six months," and "*WorldCom* would be part of that." *Id.* While this representation is welcome, the Chairman's doing "everything he can" may not suffice, as he may not be able to enforce his will on his fellow Commissioners. In any event, the representation is not enforceable unless backed up by issuance of the writ. At some point, promises are no longer enough, and we must end the game of "administrative keep-away." *American Rivers*, 372 F.3d at 420.

In granting the writ of mandamus, we do not second-guess the FCC's policy judgment to pursue a comprehensive solution to the problem of intercarrier compensation. *See Action on Smoking & Health v. Department of Labor*, 100 F.3d 991, 994 (D.C. Cir. 1996). But as we said in *MCI*, in response to a similar plea by the FCC to allow it to continue in effect rates that had been found unsupported pending the issuance of "comprehensive procedures": "[T]here must be some limit to the time tariffs unjustified under the law can remain in effect . . . . Otherwise, the regulatory scheme Congress has crafted becomes anarchic . . . ." 627 F.2d at 325. We are also, as always, "acutely aware of the limits of our institutional competence in [a] highly technical area," *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 476 (D.C. Cir. 1998), and loath to "interfere with the agency's internal processes," *United Mine Workers*, 190 F.3d at 553. But what Core asks us to do is neither technical nor intrusive. Core does not ask the FCC to promulgate any particular rule or policy; it asks only that the Commission state the *legal* authority for the current rule that refuses Core the right to reciprocal compensation. Either the FCC has such authority or it does not. If the FCC believes it has

authority, it should not take six years to put its rationale in writing. Even if the Commission ultimately decides to include ISP-bound traffic in a more comprehensive scheme, it still must have statutory authority to do so. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) ("[A]n administrative agency's power to regulate . . . must always be grounded in a valid grant of authority from Congress."). Stating that rationale now should not impede the FCC's broader rulemaking project.

B

The FCC urges us, in the event we do not reject Core's mandamus request outright, to defer a final resolution until this circuit rules on Core's appeal of the FCC's denial of its second forbearance petition. In that petition, Core asked the FCC to forbear from applying the interim rules that cap its compensation. On appeal, Core intends to argue not only that its forbearance petition should have been granted, but that it was "deemed granted" by operation of law because the FCC did not deny the petition until after the statutory deadline had passed. *See* 47 U.S.C. § 160(c) (providing that any forbearance petition "shall be deemed granted if the Commission does not deny" it within the specified time period). Core further intends to argue that, as a consequence, compensation for ISP-bound traffic is no longer governed by the interim intercarrier compensation rules, but is instead governed by § 251(b)(5)'s reciprocal compensation regime.

Although the Commission believes Core's position lacks merit and intends to oppose its appeal of the denial of forbearance, FCC counsel argues that we should defer consideration of mandamus until that appeal is decided. If Core were to prevail in its forbearance appeal, counsel argues, the Commission could no longer apply the interim compensation

rules and Core's problem would be solved. Because mandamus is an extraordinary remedy, available only if a party has "no other adequate means to attain the relief [it] desires," *Allied Chem. Corp. v. Daiflon, Inc*., 449 U.S. 33, 35 (1980), the FCC contends that we should not consider issuing the writ unless and until the alternative of a forbearance appeal is foreclosed.

But Core's appeal of the denial of forbearance is not an adequate means to attain the relief it seeks. As Core explains, forbearance offers only prospective relief: forbearance by the Commission "from applying" the interim rules in the future. 47 U.S.C. § 160(a). Core, however, seeks retroactive relief as well. In the late 1990s -- prior to the FCC's carve-out of ISP-bound traffic -- Core entered into contracts with various ILECs that provided reciprocal compensation for the ISP-bound traffic that Core terminated. The *ISP Remand Order* capped Core's compensation at lower levels.

Core maintains that only the grant of a writ of mandamus will make it whole by making retroactive relief available. If we compel the FCC to state its legal justification for the interim rules, and if that justification is not forthcoming or is invalid, we will vacate those rules. Core argues that this will mean there never was any lawful justification for the caps on its compensation: i.e., that "the FCC has enforced an *ultra vires* compensation regime since 2001." Pet'r Reply Br. 2. And that result, Core contends, will entitle it to retroactive compensation under its pre-existing contracts with the ILECs. FCC counsel does not deny this contention, saying only that it is a "very complex question . . . which I can't really speak to." Oral Arg. Recording at 20:33. We thus cannot conclude that Core's appeal of the FCC's denial of forbearance offers an adequate alternative means of attaining the relief Core desires.

We also note that the resolution of an appeal from the FCC's denial of forbearance regarding the interim compensation rules will not vindicate this court's own interest in seeing that its mandate is honored. That mandate was to explain the legal basis for those rules so that their validity could ultimately be evaluated. An appeal from the denial of forbearance, by contrast, looks at the reasonableness of the FCC's determination of three quite different issues.[9] The additional point Core intends to raise, that its petition must be "deemed granted" pursuant to 47 U.S.C. § 160(c), is likewise unrelated to the FCC's legal authority for its interim intercarrier compensation scheme.

C

There remains only the question of the content of the writ that we will issue. Core asks us to direct the FCC to promulgate

---

[9]The Telecommunications Act requires the FCC to "forbear from applying any regulation or any provision [of the Act] . . . to a telecommunications carrier or telecommunications service" if it determines that:

> (1) enforcement of such regulation or provision is not necessary to ensure that the . . . regulations . . . in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

> (2) enforcement of such regulation or provision is not necessary for the protection of consumers; and

> (3) forbearance from applying such provision or regulation is consistent with the public interest.

47 U.S.C. § 160(a); *see In re Core*, 455 F.3d at 277.

an order that explains the statutory authority for its interim rules, and to vacate those rules if the FCC does not issue such an order within 60 days. Although Core urges us to impose a 60-day deadline, it is clear that obtaining a fixed deadline is Core's foremost concern. Oral Arg. Recording at 28:56-29:35.

As we noted above, in an effort to stave off Core's request, FCC counsel represented that the Commission's Chairman intends to achieve comprehensive intercarrier compensation reform within six months. Such reform, counsel advised, would include a response to our *WorldCom* remand. We will give the Chairman a chance to meet that schedule, and will direct the Commission to issue its explanation by November 5, 2008 -- six months from the day that representation was made.

We agree with Core, however, that this must be the end of the Commission's delay. The first time we determined that the rationale for the rules was invalid, in *Bell Atlantic*, we vacated as well as remanded. 206 F.3d at 9. In less than a year, the FCC issued a new order with a new rationale. When we concluded in *WorldCom* that the FCC's second rationale was also invalid, we plainly had authority to vacate again. *See* 5 U.S.C. § 706 (stating that a reviewing court shall "set aside" agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"); *see also Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Instead, we chose only to remand, believing that there was a "non-trivial likelihood" that the Commission would be able to state a valid legal basis for its rules. *WorldCom*, 288 F.3d at 434; *see Allied-Signal*, 988 F.2d at 151 (noting that, when there is a "serious possibility that the Commission will be able to substantiate its decision on remand," we may remand without vacating). This time, there was no prompt response -- only six years of promises and further delay.

Having repeatedly, and mistakenly, put our faith in the Commission, we will not do so again. If the FCC cannot, within six months, explain its legal authority for the interim rules, we can only presume that this is because there is in fact no such authority. Under those conditions, vacatur is indicated. *See Allied-Signal*, 988 F.2d at 150-51. Accordingly, the rules will be vacated on November 6, 2008, unless the court is notified that the Commission has complied with our direction before that date.

## III

For the foregoing reasons, we grant the writ of mandamus and direct the FCC to respond to our 2002 *WorldCom* remand by November 5, 2008. That response must be in the form of a final, appealable order that explains the legal authority for the Commission's interim intercarrier compensation rules that exclude ISP-bound traffic from the reciprocal compensation requirement of § 251(b)(5). No extensions of this deadline will be granted. The rules are hereby vacated on November 6, 2008, unless the court is notified that the Commission has complied with our direction before that date. This panel of the court will retain jurisdiction over the case to ensure compliance with our decision. *See MCI*, 627 F.2d at 325.

*So ordered.*

GRIFFITH, *Circuit Judge*, concurring: I join the court's well-reasoned opinion. The circumstances that occasion today's decision lead me to question the wisdom of the open-ended remand without vacatur. In *WorldCom, Inc. v. FCC*, we opted for such a remedy after concluding that the Federal Communications Commission ("FCC") had issued an order without establishing statutory authorization. 288 F.3d 429, 434 (D.C. Cir. 2002). The FCC ignored our request for a better explanation of its statutory authority, and six years later we are forced to clean up a mess we helped create. There is a lesson here.

Remand without vacatur is common in this circuit, especially after our decision in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). But experience suggests that this remedy sometimes invites agency indifference. *See Natural Res. Def. Council v. EPA*, 489 F.3d 1250, 1262–64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."); Kristina Daugirdas, Note, *Evaluating Remand Without Vacatur: A New Judicial Remedy for Defective Agency Rulemakings*, 80 N.Y.U. L. REV. 278, 301–05 (2005) (describing instances of multi-year delay). Today's decision is a case in point. After waiting in vain for the FCC to respond to *WorldCom* of its own volition, we are forced to resort to the "extraordinary remedy" of mandamus to compel the agency to act. *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000). I join in today's decision to break out the big stick, but I hope that in the future we will take greater care to avoid putting ourselves in situations where doing so is necessary.

In writing separately, I do not address the disputed legality of remand without vacatur under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *Compare Checkosky v. SEC*, 23 F.3d 452, 462–66 (D.C. Cir. 1994) (separate opinion

of Silberman, J.) (declaring the practice lawful), *and Sugar Cane Growers Co-op v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002) (same), *with Checkosky*, 23 F.3d at 490–93 (separate opinion of Randolph, J.) (declaring the practice unlawful), *and Milk Train, Inc. v. Veneman*, 310 F.3d 747, 758 (D.C. Cir. 2002) (Sentelle, J., dissenting) (same). I simply urge future panels to consider the alternatives to the open-ended remand without vacatur. *See, e.g.*, *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (remanding without vacatur but ordering a rule "vacated automatically" absent adequate justification from the agency within 90 days); *Rodway v. USDA*, 514 F.2d 809, 817–18 (D.C. Cir. 1975) (remanding without vacatur but ordering "complet[ion of] the new rule-making process within 120 days of the issuance of this opinion"); *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 872 (D.C. Cir. 2001) (per curiam) (vacating regulations but inviting "a motion to delay issuance of the mandate"); *Honeywell Int'l, Inc. v. EPA*, 374 F.3d 1363, 1374–75 (D.C. Cir. 2004) (Randolph, J., concurring) ("It is easy to forget that when we vacate and remand, as we are doing here, there will be a safety valve. The agency, and any intervenors on its side, will have the opportunity to file post-decision motions demonstrating why an unlawful order or rule should remain in place during proceedings on remand.") (citing *U.S. Tel. Ass'n v. FCC*, 188 F.3d 521, 531 (D.C. Cir. 1999)).